## Case No. 3,939.

### The D. M. HALL v. The JOHN LAND.

[Hoff. Op. 96.]

District Court. N. D. California. Sept. 6, 1855.

SALVAGE COMPENSATION — RIGHT OF CREW OF SALVED VESSEL TO PARTICIPATE — MISCONDUCT OF SALVORS.

[1. The total amount awarded as salvage may be affected by the number entitled to share therein.]

[Contra. see Currie v. The Josiah Hathorn, Case No. 3,491a.]

[2. The transfer of the crew of a vessel in imminent peril to another vessel, pursuant to an agreement of the respective captains, does not so dissolve the contract as to entitle them to salvage for subsequent labors in saving the distressed vessel according to the agreement. The Blaireau, 2 Cranch (6 U. S.) 240; The Two Catherines, Case No. 14,288; Taylor v. The Cato, Id. 13,786; and The Florence, 20 Eng. Law & Eq. 607, distinguished.]

[3. The bona fide adoption of a certain course by salvors entitles them to compensation for work actually done in pursuance thereof, although it may subsequently appear that another course would have been better.]

[4. The amount awarded for salvage services should be more than a compensation for the mere labor employed in effecting them.]

[5. Slight misconduct of salvors under great provocation, and not resulting in any loss to claimants, should not reduce the amount of salvage.]

[6. Avarice and hard dealing by a salvor should reduce, and extraordinary energy should increase, the amount of his compensation.]

[7. $60,000 allowed upon a valuation of $260,-000, where the salving vessel abandoned a whaling cruise at its commencement, and spent about nine months in rendering the service, bringing the salved ship into port, and enforcing the claim.]

[This was a libel by the owners and mariners of the bark D. M. Hall against the ship John Land and cargo for salvage.]

Hall McAllister, William Barber, and J. B. Manchester, for libelants.

Eugene Casserly and J. P. Haven, for claimants.

Before HOFFMAN, District Judge.

Before proceeding to a consideration of the merits of this case, it is fit that I should acknowledge my obligations to the counsel concerned in it. Not only have the books been explored by them with untiring industry, and every case brought to my notice by which my judgment might be assisted, but the voluminous testimony in the cause has been analyzed and digested, and every view of the facts presented which zeal and ingenuity could suggest. I do not propose, however, to enter into an investigation of every contested fact, for I feel assured that in cases like the present, the court must be guided in forming its judgment by a general consideration of the important features of the case, rather than by a minute examination of its details.

The facts of the case are briefly as follows: On the 15th of November, 1854, the John Land, a large clipper ship, with a valuable cargo, while on a voyage from Boston to this port, and in latitude about 4° S., and longitude 103° or 104° W., was discovered to be leaking badly. Attempts were made to discover and stop the leak, but without success, and preparations were made to abandon the ship, should such a step become necessary. During the 15th and 16th, the pumps were kept constantly going, and the crew had, by the morning of the 17th, become greatly fatigued, if not exhausted, by their protracted and severe labor. The situation of the John Land was thus rendered in a high degree perilous, not only from the great danger to which a storm would expose her, but from the inability of her crew (a fact demonstrated by subsequent events) long to endure the labor necessary to keep her afloat. On the morning of the 17th, a sail was descried, and after coming up with her, an officer was sent on board to demand assistance. The vessel proved to be the D. M. Hall, Spencer Pratt, master. Capt. Pratt, pursuant to the request of Capt. Percival, master of the John Land, repaired on board the latter's ship with a view of ascertaining his situation, and, it is to be hoped, offering him assistance. Much testimony was taken to show precisely what passed at the interview between the two captains, but the general nature of the propositions, or rather demands, made by Pratt, seems to me incontestably established. After some discussion he announced to Capt. Percival his resolution to afford him assistance on one condition only, viz.: that he, Capt. Percival, should surrender to him, Pratt, his vessel and her entire cargo, and should go with his officers and crew on board the D. M. Hall, and assist in working her into some port. To this demand Capt. Percival was, of course, reluctant to submit, and after some discussion and conferences with the crew of the John Land, Capt. Pratt, desirous of putting an end to the indecision, informed Capt. Percival that he was about to return to his ship, and on reaching her would set his colors, and that if in 15 minutes thereafter Capt. Percival did not set his colors in token that the terms were acceded to, he, Capt. Pratt, would brace forward and go about his business. Capt. Percival, placed in this trying and cruel dilemma, had to choose between being abandoned on the ocean, and at the distance of more than a thousand miles from land, in a leaky ship, and with a crew which must soon be incapable of further exertion at the pumps, or on the other hand surrendering at once his command, his vessel and his cargo to the stranger, whom chance had thrown in his way. After some hesitation, Capt. Percival determined to accept the latter alternative, and the signal agreed on was accordingly made. The crew of the D. M. Hall thereupon came on board the John Land, and Capt. Percival, his officers and crew, were transferred to the D. M. Hall. The counsel of Capt. Pratt, sensible how unfavorable an impression his conduct was likely to leave on the mind of the court, have endeavored, with much ingenuity, to excuse, if not to justify it. It is contended that the proposition made by Percival, that Pratt should lie by him for twenty-four hours, was obviously absurd; that a delay of twenty-four hours could have been of no service to either party; that the condition of the ship was well ascertained, and that the expectant course proposed by Percival could have produced no beneficial results. They insist that Capt. Pratt was entitled to say in what manner and on what terms he would render the assistance required; and that the object of Capt. Percival was to restrict Capt. Pratt's service to the lowest grade, and thus unreasonably diminish his claim to compensation. But, in reply to this, it is to be observed, that it is not Capt. Pratt's refusal to adopt Percival's suggestions, which exposes him to censure; but it is the fact that, profiting by the distresses which left those with whom he was dealing no alternative, he imposed upon them hard and cruel terms, suggested by an extortionate and rapacious spirit. Undoubtedly he had a right to say on what terms he

would assist them to save their vessel, but if, in exercising that right, he has taken an advantage of the necessities of others, he is liable to the censure and punishment of the court called upon to consider the merits of his services. But reluctant to believe that the master of an American whaler could have so coldly speculated upon the calamities of a countryman as to demand as the price of any assistance the absolute and final surrender to him of so much property of such great value, I have been induced to hope that Capt. Pratt's object may have been to secure to himself the possession of the ship and cargo, as a pledge and security of his future compensation, rather than with any intention of subsequently appropriating finally to himself. The slightest acquaintance with the law must have apprised him of the futility of such an attempt and his own reason must have told him that a claim to a ship and cargo, worth $280,000, as a reward for not having abandoned to their fate on the broad ocean a company of distressed mariners, would be rejected with indignation by the tribunals of every civilized nation. But, even adopting the more lenient construction of Capt. Pratt's conduct, it is impossible to justify it—and obliged as the court always is in salvage cases to consider not merely the value of the services, but the spirit in which they are rendered, and to enforce so far as it may by its judgment, the eternal principles of humanity and justice—it must mark by its decree its disapprobation of conduct, which, to say the least, is wholly destitute of that generosity, disinterestedness and "affecting chivalry," which give in these cases the strongest claim to its favorable consideration. Upon being transferred to the John Land, the crew of the D. M. Hall were placed under the command of Mr. Sanford, first officer of the latter, and the two vessels proceeded in company on the voyage to the Sandwich Islands. On the morning of the 19th, however, Mr. Sanford went on board the D. M. Hall and announced to Capt. Pratt that he was unable to proceed further without an additional force, as his men were fatigued by the severity of the labor. After some discussion, it was arranged that Capt. Percival should return to his ship with his crew and resume the command, that a portion of the cargo of the John Land should be put on board the D. M. Hall, and that the two crews should then endeavor to get the John Land into port. Under this arrangement the transhipment was commenced, and continued until the 20th, when a dispute arose between Capt. Percival and his crew, and the latter refused to work under his orders. Capt. Pratt, on being summoned on board, appears to have endeavored to adjust the quarrel, but the men persisting in their refusal, they were allowed to select by votes the officers under whom they would serve. Capt. Crosby, a passenger on board the John Land, was accordingly chosen as master. I think it but just to Capt. Pratt to observe that he seems to have acquiesced in this measure solely with a view of saving the ship, and because the services of the crew under any one they were willing to obey could not have been dispensed with. Nothing of importance occurred until the third day after. On that day Capt. Percival, against the wishes as it seems of Capt. Pratt and Mr. Sanford, went on board the John Land. What he said on reaching her deck cannot with certainty be ascertained from the evidence. But whether or not he ordered the pumps to be stopped, it is at least certain that he said or did something which had the effect of throwing everything into confusion. The men believing, as they swear, that some foul play was going on between the captains, ceased pumping, and prepared to abandon the John Land. Capt. Crosby went on board the D. M. Hall, and being persuaded by Pratt to return, he soon came back and reported the crew to be in such a condition as rendered it impossible and unsafe for him to resume the command. Capt. Pratt seems now to have almost abandoned the hope of saving the ship, and the appearances were certainly very discouraging. Mr. Stevens, however, who had been chosen by the crew to act as mate under Crosby, urged the crew to remain at the pumps while he should go on board the John Land [the D. M. Hall], and endeavor to make some satisfactory arrangement with the two captains. The crew intimated their willingness to help save the ship, provided some agreement was made or they could be satisfied that they would get something for their work. Fargo, one of their number, said to him, that they could work the vessel along without much trouble, if "Capt. Percival and his officers would keep away, and not keep making such confusion." Mr. Stevens accordingly went on board the John Land [the D. M. Hall], to have an interview with the captains, and the crew resumed their labor. Capt. Pratt, on learning from Mr. Stevens what he and the crew required, assented to his demand, and the original paper by which Percival had surrendered his ship to Pratt, was given to him with an indorsement upon it certifying to Capt. Percival's sanity. Upon receiving this paper, Stevens returned to the John Land, and read it to the crew, who declared themselves satisfied and willing to persevere in their labor. The ship continued her voyage, accompanied by the D. M. Hall, and arrived at Nukaheeva, about fifteen or sixteen days afterwards. Before reaching that place, Pratt and Percival both endeavored to persuade the men to continue on to Tahiti, but they declined to do so, declaring that they stood in absolute need of repose. On arriving at Nukaheeva, the command of the ship was restored to Percival, and, after some delay, she proceeded to Tahiti with him as master, Stevens as mate, Thatcher as second mate, and Barnes, third mate of the barque, as third mate. Her crew comprised, as before, the greater part of the crews of both ships. The voyage to Ta-

hiti lasted eight days. At Tahiti facilities for repairing her could be obtained. Her cargo was accordingly discharged and the leak was stopped. The salvage service of the libelants was now completed, but by the advice of the American consul, the master of the D. M. Hall proceeded to this port to obtain from this court the compensation to which he and his crew might be entitled. The John Land arrived here shortly after, and the present suit was instituted.

From the foregoing summary of the facts in this case, it is evident that the libelants performed a salvage service of a high degree of merit. Without their interposition the ship and her cargo must almost inevitably have been lost. The fact that Percival and his officers felt themselves constrained to accept the terms· proposed by Pratt, is sufficient to demonstrate the perilousness of their situation; and it abundantly appears, from all the evidence, that the labors of the exhausted crew of the John Land could not have been long protracted, and that, in Capt. Percival's language, in a few days she must have sunk. The labor of the crew by whom she was saved, was arduous and long continued; and though their services cannot be deemed to have involved any considerable risk, or to have elicited any extraordinary display of gallantry, it exceeded in severity and in duration that of many salvors to whom the courts have allowed liberal compensation. The D. M. Hall was, as has been stated, a whaler, and had just arrived at the beginning of the season on whaling ground. By engaging in this service she was compelled to abandon her whaling voyage and relinquish the profits of that employment.

Before proceeding to fix the amount of salvage to be allowed in this case, it is proper to consider who are entitled to share in the amount awarded, for I cannot but consider that the question whether the compensation decrees be excessive or just, must depend in some degree upon the number of those who are to receive it, and what amount will fall to the share of each. It has been strenuously urged by the advocates for the crew of the John Land, that they are entitled to claim as salvors, and that as they participated in the labor, it would be unjust to refuse them a share in the reward. The claim of these seamen has been placed on the ground that their contract was dissolved, and they were discharged from any further duty as mariners, by their leaving the vessel with the consent of the master; that if they subsequently assisted in saving the ship, they did so as volunteer salvors, and, as such, are entitled to the reward. It is not denied that when the mariner's relation to the vessel has been dissolved de facto, or by operation of law, the circumstance that he has been a seaman on board of her will not preclude him from a salvage allowance. Such was the case of The Blai-

reau, 2 Cranch [6 U. S.] 240, where the master had abandoned the vessel with his whole crew, but had left, it would seem by design, one seaman on board. It was held that the master had discharged him from all further duty under his contract, as far as any act whatever could discharge him, and it little became those who devoted him to the waves to set up a title to his further services. So, too, in the case of The Florence, 20 Eng. Law & Eq. 607, where a ship was by order of the master abandoned, and her crew, which had been landed at Vigo, were by order of the British consul put on board a steamer to be taken home. On the day after leaving Vigo, the steamer fell in with the abandoned vessel, and the mate and part of the crew of the latter, thereupon volunteered to return to her; the master and the rest of the crew remained on board the steamer. It was held by Dr. Lushington, that the mate and seamen who thus volunteered were entitled to salvage. The principle established by this decision, as well as by that of The Two Catherines [Case No. 14,288], is that the character of seamen does not create an incapacity to assume that of salvors; and it was further held in The Florence [supra] that where a ship is abandoned at sea "sine spe revertendi aut recuperandi," in consequence of the perils of the sea, such abandonment being bona fide and by order of the master, to save life, the contract of the seaman is dissolved, and he may afterward assume the character of a salvor. In the case of Taylor v. The Cato [Case No. 13,786], the ship had been wholly abandoned, and her officers and crew taken on board the Alexandria. The latter then pursued her voyage, but six days afterward, by an extraordinary accident, fell in with the abandoned ship. The crew of the Cato assisted in saving part of her cargo, and were allowed a small salvage compensation.

It is apparent, that in the cases cited the vessel had been abandoned by the master and crew "sine spe revertendi aut recuperandi," and the contract of the latter dissolved. But the question is, was there such an abandonment in this case? It seems clear to me that there was not. The master. it is true, authorized the crew to go on board the saving ship, but did he mean to relinquish thereby all hope of ever regaining possession of his vessel? On the contrary, his object and intention were to secure her safety. He himself, or his crew, were, by the very nature of the arrangement, to contribute to the salvage, by working the ship on board which they went, and the crew of which were [to come] on board the John Land. So far from abandoning her, the vessel on which they were was to accompany the ship into port, and on arriving there, if not before, as proved to be the case, the master must have expected to regain his ship. To have supposed that by the temporary and forced surrender of his ship to Capt. Pratt,

he finally and forever lost all chance of recovering or returning to it, the master must have been strangely ignorant of his rights, and those of his owners. Nor can I conceive that even Capt. Pratt, or any of his crew, could have entertained so wild a notion. It is not the mere leaving a ship by authority of the master, that vacates the seamen's contract. In the case of shipwreck, when the crew have reached shore, the seamen are not at liberty to refuse further exertion, and disperse themselves over the country. They are bound to remain by the wreck, and assist in preserving the fragments. If they do so, they are entitled to their wages out of the savings. Whether this allowance should properly be deemed wages, or a salvage compensation, is disputed, and perhaps, as observed by Curtis (Merch. Seam. p. 2, 287), the distinction is but shadowy, for, in practice, the allowance rarely exceeds the amount which would have been earned as wages. The Two Catherines [supra]: The Cato [supra]; The Neptune, 1 Hagg. Adm. 227. If, then, leaving a shipwrecked vessel by the master's authority, and where irremediable disaster leaves no alternative, does not vacate the contract, the transfer of a crew to a saving ship, under circumstances like those of the present case, ought not to produce such an effect. If the rule of law which does not allow seamen to become salvors in the ordinary course of things, and while in the performance of their duties, whatever may have been the perils or hardships, or gallantry of their service in saving the ship and cargo, has any solid foundation in true policy, the same principle demands that they should not be permitted to assume that character on the ground that their contract has been vacated, except in extraordinary cases, where their relation to the vessel has been finally and unequivocally dissolved, and where the master has permanently renounced all hope of recovering or returning to her. Such is not the present case, and I am persuaded that I should violate the spirit which pervades the maritime law on the subject of the duties of seamen, if I should, under circumstances like the present, admit them as salvors, and thus in effect declare that in this case from the moment they left the ship they were at perfect liberty to disregard the orders of their officers, and to give or withhold their services at their pleasure.

The crew of the D. M. Hall being thus the only parties in court entitled to be deemed as salvors, the quantum of salvage remains to be considered. The counsel for these parties have argued that their allowance should be more than usually liberal, as the vessel was saved, contrary to the wishes and almost in spite of Capt. Percival. On reviewing of all the evidence as to Capt Percival's conduct, we have certainly need of all our charity to reconcile the language imputed to him with an intention fully to discharge his whole duty. But notwithstanding many wild and most improper expressions, I cannot bring myself to the conclusion that he ever deliberately wished for the destruction of his vessel. I rather incline to the belief, that overwhelmed by the extent of the disaster that had befallen him, and unable to contemplate with composure the probable results to himself, his reason may at times have been disturbed, and he may have been betrayed into incoherent expressions, the offspring of the distress of a spirit perplexed in the extreme, rather than the indications of the settled purpose of his mind. He may, perhaps, at moments when he realized most intensely the situation in which he was placed, have indulged and given utterance to the thought, that the waves which closed over his vessel would also bury beneath them the memory of any faults he might have committed, and that on his return home compassion would silence censure. That there was something in his manner and conduct which suggested the idea that he was not in his perfect mind is evident, not only from the expressions of the crew, but from the fact that a certificate of his sanity was signed by his own officers,—a circumstance which could hardly have occurred, if no suspicions to the contrary had been entertained. That he was not equal to the emergency which arose, cannot be doubted; but I prefer to think, that advanced in years, and with energies spent in the long service of a life, he succumbed to ill-fortune, rather than that he entertained the criminal purpose which some of the witnesses attributed to him. But in any view, I cannot think that his intentions or wishes can affect the merits of these salvors. Their duty was clear, and their interest coincided with their duty. The only point of view in which it would become material to consider Capt. Percival's conduct, would be in estimating what amount of censure was due to the crew for their refusal to obey him. As, however, they have been paid their wages, and I believe them not entitled, by law, to share in the salvage, their conduct need not now be the subject of examination.

It has been urged by the counsel for the claimants that the allowance of the salvors in this case should be greatly diminished on account of their general misconduct, and particularly because, instead of bringing the vessel to this port, she was taken by them to a remote island far out of the course, from whence she only reached this place after protracted delays. With regard to their alleged misconduct, I can only express in a general way the conclusion at which I have arrived. It seems to me that although some disorder prevailed among the crew, it chiefly occurred at the time when, owing to the interference of Capt. Percival, all hope of saving her had been well nigh abandoned. As soon as Mr. Stevens obtained the control, order seems to have been restored, and the men for the

remainder of the voyage behaved with regularity and subordination. In the confusion after Crosby left, no doubt some excesses were committed, but we have no means of ascertaining by which of the crew, nor even how many participated in them. In judging of the conduct of seamen, under such circumstances, some leniency ought, in justice, to be shown, and some allowance made for the feelings of indignation and disappointment with which they saw themselves about to be deprived, as they thought, of all remuneration for their labor.

With regard to the alleged deviation from the course the vessel ought to have pursued, there is more difficulty. On reviewing the testimony, however, on this point, it is not easy to say what course should have been adopted. Judging by the event and by the knowledge since acquired of the extent of the leak, it certainly is to be regretted that the vessel was not headed at once for San Francisco. But there is nothing in the evidence to justify me in saying that the salvors were grossly culpable for not doing so. They seemed to have exercised their judgment fairly upon the point, and the court cannot with certainty affirm that their determination was not, under the circumstances, a prudent one. Where no improper motive is assigned for adopting the course pursued, and where the result has been entirely successful, a court ought not to lend a willing ear to criticisms upon the mode of effecting the salvage, which has been adopted, or to suggestions that perhaps some other mode might have been more advantageous.

The quantum of salvage to be allowed in this case remains to be fixed. On this part of the case precedents, as observed by Judge Peters, have little application. The whole subject is open to discretion, and must depend upon the particular circumstances of the case. One principle is, however, clear.—that the allowance for such services should exceed a mere compensation for work employed in effecting them. Public policy and the general interests of humanity require that strong inducements should be held out to those who navigate the ocean, to assist in the preservation of property exposed to destruction. Nor can the owners of the property justly complain that a considerable portion of it is given to those without whose interposition all would have been lost. I have carefully examined almost all the cases cited by the parties on the hearing, with a view of ascertaining what has been the extent to which the courts have felt themselves at liberty to exercise liberality rather than with any expectation of deriving from them any fixed rule by which my discretion should be governed. In this case, it is to be considered that the value of property saved is very large—about $260,000 after deducting the bottomry bond, given to enable the ship to reach this port. The labor necessary to effect the salvage was protracted and severe.

The time consumed in the undertaking and in the measures necessary to enforce the rights of the salvors has been nearly nine months, and during all that time the bark has been useless to her owners, with the exception of the small amount earned by her on her voyage from Tahiti to this port. To enter upon this service, she was obliged to abandon her whaling adventure and renounce her expectations of profit from that source. On the other hand, there has been no extraordinary risk encountered, nor has there been any signal display of gallantry or generosity. The merit of the service is not enhanced by the saving of human life under appalling circumstances; nor was there, at any time, any reasonable chance, if the undertaking was conducted with ordinary skill, that the fruits of the labor of the salvors would be lost. The business was coolly undertaken and conducted with a view to a compensation almost certain to be obtained. And if by the decree of this court that compensation is fixed at a sum several times exceeding any probable earnings of the crew during the same period, it seems to me that nothing more should be demanded. It is not to be forgotten, that the safety of the vessel is not alone due to the crew of the D. M. Hall, for without the assistance of the crew of the John Land, the undertaking was found to be impracticable.

Under all the circumstances, I think the sum of $60,000 is a just and fair allowance, and for that amount I accordingly decree. It would extend this opinion beyond all reasonable limits, if I were to attempt to review the cases which have been cited as most nearly resembling that under consideration. One, however, may be mentioned, of the highest authority in American courts, and decided by the greatest of American judges, and which certainly presented circumstances entitling the salvors to the exercise of the utmost liberality. The Blaireau, a French vessel, having sustained great injury by a collision, had been abandoned by her officers and crew, except one man. In this situation, she was fallen in with and saved by the ship Firm. The circumstances under which the salvage was effected, are detailed in the following extract from the report of the case (2 Cranch [6 U. S.] 240): "When the Blaireau was taken possession of (by the salvors) she had about four feet of water in her hold, and could not have floated twelve hours longer. There was great risk and peril in taking charge of her. She was brought into Chesapeake bay, after a navigation of nearly 3,000 miles, by six persons, her proper complement being sixteen men. The Blaireau was navigated without boats or anchors; she required to be pumped every two, three or four hours in fair weather, and in blowing weather, every hour. The bow was secured by a covering of leather, copper and sheet-lead, nailed on, and pitch and turpentine in large quantities, poured down hot between

the planks and coverings. The labor of working the Blaireau by the men on board was great and severe, and they had frequently thought of abandoning her, but fortunately persevered. She was a slight built vessel, and constructed without knees, and was very weak. The forestay was gone, and the foremast was secured by passing a large rope through the hawse holes and securing it to the foremast head. It was the opinion of several experienced sea captains, that the bringing in the Blaireau was a service of great risk and peril, and nearly desperate, and such as they would not have undertaken." The district court allowed three-fifths salvage; but the supreme court reduced the allowance to two-fifths, the whole value of the salved property being about $60,000. The vessel and cargo were, however, in reality, charged in consequence of savings produced by the forfeiture of the master's share. and the reduction of those of the other officers, with not more than one-third of the "gross value of the property." If the circumstances of this case be compared with those of the case at bar. the difference in the merits of the services is apparent. The John Land had neither been shattered by a collision, nor strained by a tempest. She was a strong and well built clipper, in every respect seaworthy, except for a leak arising from an opening of a seam, caused by insufficient caulking. From the moment when it was ascertained that the leak did not increase it was evident that the task of saving her, though requiring labor, was almost certain to be accomplished. No skill or intrepidity on the part of the salvors was called into action, and their labor, though arduous, was less than in boisterous weather on approaching a coast is often required of a crew. During all the time the men had their regular watches below, and while on deck their numbers permitted to take turns at the pumps, each man working only half an hour at a time. The D. M. Hall accompanied them during the whole voyage. and in case of accident her whale boats, peculiarly fitted for the purpose, were ready at all times to take them off. So lightly did the men think of the danger that they seem to have been willing, on the third or fourth day, to part company with the D. M. Hall and pursue their voyage alone. It seems to me clear that the whaler must be regarded as having abandoned one employment and undertaken another, attended with as little risk and the remuneration for which was more certain. The value of the whaler was about $25,000. The gross value of her catchings. on a very liberal estimate, would not have exceeded $20,000 for the season; out of which was to be paid the wages and provisions of the crew, with other expenses. The decree of the court allows three times that amount. The allowance is, I think, not excessive, for it is to be considered that by means of these libelants property to the amount of $280,000 was saved from destruc-tion. The salving vessel has been useless to the owners for nearly nine months, except a small freight on the voyage from Tahiti to this port. She has incurred some expenses and sacrificed some property in performing the salvage service, and on resuming her cruise she will be obliged to refit at an expensive port. I think that the public policy demands that the remuneration in these cases should be liberal, and that inducement of the strongest kind should be held out to others to undertake similar services. In apportioning the sum decreed, I have given an amount somewhat exceeding a third to the owners of the ship, for it appears that they have paid the wages of the crew for all or a greater part of the time elapsed since the whaling cruise was abandoned, and various expenses have been incurred by them, which should be reimbursed. I have also thought it right to increase the share to which Stevens would have been otherwise entitled, for to him, more than to any other one person, the success of the undertaking is attributed. Fargo's allowance has also been somewhat increased.

The evidence has not disclosed which of the crew of the D. M. Hall were on board the John Land, and which remained on their own vessel. I have not therefore attempted to discriminate between them. I regret to be obliged to diminish to a considerable amount Capt. Pratt's share, for though we may perhaps acquit him of the inhumanity and merciless rapacity with which he has been charged, yet I think that his conduct, under the most charitable view that can be taken of it, deserves rebuke at the hands of the court. In other respects I have followed in fixing the allowance of the officers and crew the proportions or lays to which by the articles they were entitled. This mode seemed to me the most just I could adopt, for the salvage undertaking was substituted for the whaling cruise by general consent, and it seems right that the profits of the substituted adventure should be distributed in the same proportion as that agreed on for the distribution of the profits of the original employment. The costs and expenses are to be paid by the claimants.